**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| VIVIAN VALLES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-12-0453 |
| | § | |
| CAROLYN W. COLVIN,[1] Commissioner, | § | |
| Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry #3).  Cross-motions for summary judgment have been filed by Plaintiff Vivian Valles ("Plaintiff," "Valles"), and by Defendant Carolyn W. Colvin ("Defendant," "Commissioner"), in her capacity as Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #11; Defendant's Cross-Motion for Summary Judgment and Brief in Support of Cross- Motion for Summary Judgment ["Defendant's Motion"], Docket Entries #8, #4).  Each party has responded to the other's motion. (Plaintiff's Response, Docket Entry #13; Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #12).  After considering the pleadings, the evidence submitted, and the applicable law,

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Under Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this lawsuit.

it is RECOMMENDED that Plaintiff's motion be DENIED, and that Defendant's motion be GRANTED.

**Background**

On February 18, 2010, Vivian Valles filed an application for disability insurance benefits ("DIB"), under Title II of the Social Security Act ("the Act").  (Transcript ["Tr."] at 10).  On February 25, 2010, Valles also filed an application for supplemental security income ("SSI"), under Title XVI of the Act. (*Id.*).  In her applications, Plaintiff claimed that she had been unable to work since September 1, 2006, due to fibromyalgia.[2]  (Tr. at 162).  On June 18, 2010, the SSA denied Plaintiff's applications for benefits, finding that she was not disabled as defined by the Act.  (Tr. at 10).  On August 23, 2010, Plaintiff petitioned for a reconsideration of that decision, but her request was denied.  (*Id.*).

On September 8, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 96).  Her request was granted, and the hearing took place on January 3, 2011, before ALJ Daniel E. Whitney.  (Tr. at 106).  Plaintiff appeared with her attorney, Gerard F. Lynch ("Mr. Lynch"), and she testified in her own behalf.  (Tr. at 26-65).  The ALJ also heard testimony from Ronald Valles ("Mr. Valles"), Plaintiff's brother, and from Kay S. Gilreath ("Gilreath"), a vocational expert.  (*Id.*).  No medical expert appeared at the hearing.  On February 7, 2011, the ALJ engaged in the following five-step, sequential analysis to determine whether Valles was capable of performing

---

[2] "Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance.  Common sites of pain or stiffness can be palpated in the lower back, neck, shoulder region, arms, hands, knees, hips, thighs, legs, and feet."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH

substantial gainful activity or was, in fact, disabled:

> 1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

> 2.      An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

> 3.      An individual who "meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

> 4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

> 5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  It is well-settled that, under this analysis, the claimant has the burden to prove any disability that is relevant to the first four steps.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work that exists in the national economy.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Randall v. Astrue*, 570 F.3d 651, 652 (5th Cir. 2009) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

---

DICTIONARY 632 (5th ed. 1998).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability. *See Perez*, 415 F.3d at 461; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). A person is disabled only if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Randall*, 570 F.3d at 653 (quoting 42 U.S.C. § 1382c(a)(3)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Perez*, 415 F.3d at 461. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Randall*, 570 F.3d at 657 (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work" which exists in the national economy. *Id.* (quoting 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence, the ALJ determined that Valles suffers from "arthralgia and degenerative disc disease of the cervical and lumbar spine," and that those impairments are "severe." (Tr. at 12-13). He concluded, however, that none of Valles' impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations. (Tr. at 13). The ALJ then

4

determined that Valles "has the residual functional capacity ("RFC") to perform light work." (*Id.*). The ALJ found that Valles could perform her "past relevant work as a medical assistant," and that "this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Tr. at 18). With that, the ALJ concluded that Valles "has not been under a disability, as defined in the Social Security Act, from September 1, 2006, through the date of this decision," and he denied her applications for benefits. (Tr. at 18-19).

On August 23, 2010, Plaintiff requested a review of the ALJ's decision. (Tr. at 10). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; [or] (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. In considering Plaintiff's request, the Appeals Council reviewed additional evidence that Valles provided following the hearing before the ALJ. (Tr. at 4). On December 14, 2011, the Appeals Council denied Plaintiff's request for a remand, finding that no applicable reason for review existed. (Tr. at 1). With this ruling, the ALJ's decision became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On February 13, 2012, Valles filed this suit, pursuant to § 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the Commissioner's decision. (Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Plaintiff's motion be denied, and that Defendant's motion be granted.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.*  "Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion."  *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

**Discussion**

Before this court, Valles contends that the ALJ committed a number of errors. (Plaintiff's

6

Motion at 1-2).  She claims, first, that the ALJ's decision "that [she] could return to her prior work as a medical assistant is not supported by Defendant's finding that [she] could only occasionally perform "handling" and "fingering." (Plaintiff's Response at 2).  Plaintiff also contends that the ALJ erred because he "failed to consider the finding by Defendant's own consultative examiner that [she] was limited to lifting a maximum of five pounds."  (*Id.* at 5).  In addition, Plaintiff argues that the ALJ erred by "fail[ing] to evaluate and consider [her] depression and its non-exertional limitations adversely affecting [her] potential ability to maintain and sustain a full-time competitive job." (*Id.* at 6). Plaintiff further claims that the ALJ erred because he failed "to evaluate and consider [her] medications and their side effects."  (*Id.* at 8).  Finally, Plaintiff contends that the ALJ improperly "failed to follow [her] treating Physician's opinion that she was unable to work a full eight hour day." (*Id.* at 10).  The Commissioner insists, however that the ALJ properly considered all of the available medical evidence, testimony, and medical opinions in determining that Valles is not disabled.  (Defendant's Response at 1-7).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records show that, on October 18, 2006, Valles was seen at Atascocita Primary Care, P.A., by Dr. Huong Hoang ("Dr. Hoang"), a family practitioner, for "chest pain palpitations, shortness of breath, abdominal pain, diarrhea, and heartburn." (Tr. at 306).  Dr. Hoang noted that Valles had a history of precordial[3] chest pain and heartburn.  (*Id.*).  She also noted that Valles' abdominal pain began seven years ago, after she had undergone a hysterectomy.  (*Id.*).  Dr. Hoang ordered a series of laboratory tests, which showed "hyponatremia,[4] an abnormal EKG

---

[3] "Precordial" means "pertaining to the precordium, which forms the region over the heart and the lower part of the thorax."  *Id.* at 1307.

(electrocardiogram), and findings on examination of urine, NEC."[5]  (Tr. at 355).  Dr. Hoang referred

Valles to Dr. Kham D. Luu ("Dr. Luu"), a pulmonologist, for an evaluation of her complaints of

shortness of breath and fatigue.  (Tr. at 402).  On December 14, 2006, after a follow-up appointment,

Dr. Hoang reported that Valles had plans to see a gastroenterologist regarding her heartburn, and

was also scheduled for a pelvic reconstruction, ooperectomy, and hernia repair.  (Tr. at 380).

On January 2, 2007, Valles was admitted to Northeast Medical Center, where Dr. Miles E.

Mahan ("Dr. Mahan"), an obsterician/gynecologist, performed an "exploratory laparotomy,[6] bilateral

salpingo-oophorectomy,[7] lysis of adhesions,[8] and omental biopsy."[9]  (Tr. at 286).  Ten days after the

surgery, Dr. Mahan evaluated Valles for reported abdominal pain, and determined that some of it

was due to "adhesions" resulting from a partial hysterectomy she had undergone in 1999, and the

remainder was due to "stricture."[10]  (Id.).  Dr. Mahan reported that Valles was feeling much better,

and that "the mobility [she] once had problems with due to pain, is much better now."  (Id.).

Almost two years later, on December 4, 2008, Valles returned to Dr. Hoang, complaining of

---

[4]  The term "hyponatremia" refers to "a lower than normal concentration of sodium in the blood, caused by inadequate excretion of water or by excessive water in the circulating blood stream."  Id. at 800.

[5]  "NEC" is an "abbreviation for necrotizing enterocolitis." Id. at 1086.

[6]  "Laparotomy" is defined as "any surgical incision into the peritoneal cavity, usually performed under general or regional anesthesia, often on an exploratory basis."  Id. at 915.

[7]  "Salpingo-oophorectomy" is "the surgical removal of a fallopian tube and an ovary."  Id. at 1447.

[8]  "Lysis" the "destruction or dissolution of a cell or molecule through the action of a specific agent."  Id. at 971-72.

[9]  The term "omental" refers to the "omentum," which is "an extention of the peritoneum that enfolds one or more organs adjacent to the stomach."  Id. at 1142.

[10]  The word "stricture" refers to "an abnormal temporary or permanent narrowing of the lumen of a hollow organ, such as the esophagus, pylorus of the stomach, ureter or urethra. It is caused by inflammation, external pressure, or scarring." Id. at 1550-51.

"allergies; sinus symptoms; sore throat; and bone aches."  (Tr. at 351).  Dr. Hoang found that Valles was suffering from "acute sinusitis, frontal; and allergies," and she prescribed antihistamines, nasal sprays, and a "prophylatic or diagnostic injection."  (Tr. at 353).

In May 2009, Valles returned to Dr. Hoang "presenting leg pain."  (Tr. at 348).  Dr. Hoang prescribed a muscle relaxant.  (Tr. at 347).  Valles returned to Dr. Hoang on November 10, 2009, complaining about "low[er] back pain, upper back pain, elbow pain, finger pain, hand pain, and shoulder pain."  (Tr. at 337).  Valles told Dr. Hoang that she had recently gone to the emergency room because of the pain, and that she had been prescribed Vicodin; however, no medical records of this emergency room visit are among the medical records.  (*Id.*).  Dr. Hoang diagnosed Valles as suffering from "joint pain, multiple sites; joint stiffness, multiple sites; possible fibromyalgia; upper back pain; low[er] back pain; shoulder pain, bilat; elbow pain, bilat; wrist pain, bilat; hand pain, bilat; knee pain, bilat; ankle pain, bilat." (Tr. at 340-41).

On February 23, 2010, Valles had her first appointment in which "possible fibromyalgia" was specifically addressed.  (Tr. at 335).  No diagnosis was made at that time.  (*See id.*).  On March 31, 2010, Dr. Chris Wright ("Dr. C. Wright"), a radiologist/neuroradiologist, performed an MRI of Valles' cervical spine and lumbar spine.  (Tr. at 243-45).  The results showed "mild spinal canal stenosis[11] at the C4/5 and C5/6 levels"; "disc desiccation,[12] ligamentous thickening and bony hypertrophic changes at the remaining cervical levels"; "straightening of the cervical spine with mild reversal of its normal curvature"; and "evidence for posterior annular tears of the high intensity

---

[11]  The "spinal canal" is defined as "the cavity within the vertebral column."  *Id.* at 1522.  "Stenosis" refers to "an abnormal condition characterized by the constriction or narrowing of an opening or passageway in a body structure."  *Id.* at 1539.

[12]  "Desiccant" is "any agent or procedure that promotes drying or causes a substance to dry up."  *Id.* at 472.

zones at L4/5 and L5/S1." (Tr. at 244-46).  Dr. C. Wright observed that these problems "could result

in discogenic pain." (*Id.*).

On May 4, 2010, Valles returned to Dr. Hoang.  (Tr. at 330).  At that visit, she denied pain in

her neck or lower back, but did complain of pain in her upper back.  (*Id.*).  Valles saw Dr. Hoang

again on September 1, 2010, suffering from a "rash located on the left chest . . . and upper back . . .

and left side of back," and from "upper back pain . . . most prominent in the thoracic spine." (Tr. at

328).  Dr. Hoang noted that this was an "acute episode, with no prior history of back pain," and that

Valles stated that the "pain started two weeks ago" with "no precipitating event or injury." (*Id.*).

Valles told Dr. Hoang, as well, that "she has not found anything that helps relieve the pain," and that

"nothing in particular aggravates the pain." (*Id.*).  Dr. Hoang prescribed Vicodin to alleviate her

"left mid back pain," and told her to return for a follow-up visit in six days "if problems worsen or if

new symptoms develop." (Tr. at 330-31).  She prescribed antibiotics for the rash.  (Tr. at 331).

Valles returned to Dr. Hoang on September 7, 2010, complaining of "left sided pain." (Tr. at 325).

Dr. Hoang ordered laboratory tests, and Valles tested positive for shingles.[13]  (Tr. at 326-27).  On

December 7, 2010, Valles saw Dr. Hoang and reported depression, "insomnia, sore throat,

fibromyalgia, and fatigue." (Tr. at 322-23).  Valles described symptoms such as "anhedonia,[14]

decreased appetite, insomnia, crying spells, fatigue, sadness, and feelings of worthlessness." (Tr. at

320).  Dr. Hoang prescribed antibiotics and Cymbalta, an anti-depression and anxiety medication.

(*Id.*).  On December 9, 2010, Valles again complained about "anxiety, depression, [and] insomnia."

---

[13] "Shingles," otherwise known as "herpes zoster," is "an acute infection caused by reactivation of the latent varicella
zoster virus (VZV), which mainly affects adults.  It is characterized by the development of painful vesicular skin
eruptions that follow the underlying route of cranial or spinal nerves inflamed by the virus." *Id.* at 757.

[14] "Anhedonia" is "the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable. It
is often a characteristic of major depression."  *Id.* at 93.

(Tr. at 317). She stated that her "depression has been evident for the past two months," and that her "symptoms are frequent and present most days." (*Id.*). Dr. Hoang recommended that Valles continue with the Cymbalta, and follow-up in one week if problems relating to depression, generalized anxiety, or insomnia worsened, or new symptoms developed. (Tr. at 319). Dr. Hoang also noted possible "[degenerative] cervical intervertebral disc, degeneration of lumbar disc, and fibromyalgia," and planned to refer Valles to a pain management specialist. (*Id.*). On December 16, 2010, Valles saw Dr. Hoang again, complaining about anxiety, depression, and insomnia. (Tr. at 314-16). The doctor determined that her symptoms might be due to a vitamin B12 deficiency, and she administered a 2000 mcg IM vitamin B12 injection. (Tr. at 316).

The next medical records show that, on December 9, 2010, on Dr. Hoang's referral, Valles went to Dr. Randall Wright ("Dr. R. Wright"), a neurologist, for an evaluation of her "neck pain, upper back pain, lower back pain, limb pain, arthralgias,[15] myalgias,[16] and generalized pain due to fibromyalia." (Tr. at 320). Dr. R. Wright, in turn, referred Valles to Dr. Mikhail Bishai ("Dr. Bishai"), a pain management specialist, to address the possibilities of "long term management of C-spine and L-spine D[egenerative] J[oint] D[isease] and Fibro[myalgia]." (Tr. at 294). On March 17, 2010, Valles returned to Dr. R. Wright, complaining of "fibromyalgia." (Tr. at 304). Dr. R. Wright reported that Plaintiff's "history and physical exam is suggestive of fibromyalgia, but other conditions need to be ruled out." (*Id.*). Dr. R. Wright remarked that, in the interim, Valles "should continue with Lyrica 75 mg [till I discontinue], and we may increase in the near future." (*Id.*). Dr. R. Wright noted that he would also "get [an] MRI of C-spine and L-spine to eval[uate] for degenerative

---

[15] "Anthralgia" means "joint pain." *Id.* at 126.

[16] "Myalgias" is "diffuse muscle pain, usually accompanied by malaise." *Id.* at 1065.

disc disease." (*Id.*).

On May 11, 2010, Dr. George M. Isaac ("Dr. Isaac"), an internist, examined Valles on behalf of the state. (Tr. at 253). Dr. Isaac determined that Valles could "lift and carry objects of five pounds to forty feet." (Tr. at 255-56). He also found that "she [was] unable to squat or walk on her toes or heels or do tandem walking or hop." (*Id.*). In addition, Dr. Isaac found that Valles was "unable to bend and touch the finger to the floor," and that she was "unable to stand on either leg alone even with support due to pain in knees and hips and her back." (*Id.*). Dr. Isaac noted, however, that Valles was "able to sit and stand and ambulate office area . . . without assistive device and slowly." (Tr. at 256). Dr. Isaac concluded that Valles' "ability to reach and feel and grasp [was] weak in both hands due to pain in muscles and joints," and that she "[was] unable to do repetitive movements of hands and fore arms [sic] rapidly due to pain in joints." (*Id.*).

On June 14, 2010, Dr. John Durfor ("Dr. Durfor"), an internist, completed a physical RFC assessment of Valles, on behalf of the state. (Tr. at 257). Dr. Durfor identified "fibromyalgia" as the primary diagnosis. (*Id.*). Dr. Durfor determined that Valles could lift or carry items weighing twenty pounds "occasionally," and ten pounds "frequently," and that she could stand or walk "for a total of at least two hours in an eight-hour day." (Tr. at 258). Dr. Durfor also found that Valles could sit "for a total of about six hours in an eight-hour day." (*Id.*). He found no limit on Valles' ability to push and or pull. (*Id.*). Dr. Durfor determined, as well, that Valles could "frequently" climb "[a] ramp or stairs, and balance"; "occasionally," climb "a ladder, rope, [or] scaffolds"; and "occasionally" "stoop, kneel, crouch, or crawl." (Tr. at 259). Dr. Durfor acknowledged the findings of the MRI performed on March 31, 2010, by Dr. R. Wright, and determined that "claimant's symptoms . . . diminish the capacity for work activities." (Tr. at 264). Dr. Durfor also noted that

Valles' "range of motion of cervical spine shows that extension is zero and flexion and lateral flexion are limited to three degrees and rotations are moderately limited with pain . . . handling and fingering are also limited." (*Id.*).  While Dr. Durfor determined that Valles was "credible," he stated that he did not believe there was sufficient medical evidence that she was disabled at the relevant time. (*Id.*).

On July 21, 2010, Dr. Moira Dolan ("Dr. Dolan"), an internist, completed a physical RFC assessment of Valles, on behalf of the state. (Tr. at 270).  Dr. Dolan identified "myalgia" as the primary diagnosis, and "arthralgia" as the secondary diagnosis. (*Id.*).  Dr. Dolan found that Valles could lift or carry items weighing twenty pounds "occasionally," and items weighing ten pounds "frequently." (Tr. at 271).  She determined that Valles could stand or walk for a total of "about six hours in an eight-hour workday," and that she could sit "for a total of about six hours in an eight-hour workday." (*Id.*).  In addition, Dr. Dolan found that Valles' ability to push or pull was "unlimited." (*Id.*).  Dr. Dolan found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 272-74).  However, Dr. Dolan also pointed to "[straight-leg raise test[17]] results," stating that they were "supposedly positive at 10 degrees but this is not consistent with ability to ambulate without assistance, and it is also not consistent with the lumbar MRI which only suggests annular tears and minimal disc protrusions without nerve root compromise." (*Id.*).  Dr. Dolan noted that Valles "demonstrates poor strength in [her] hands in the absence of any signs of arthritis." (*Id.*).  Dr. Dolan stated that, while claimant "alleges chronic pain," she is "not on any narcotics and has no record of interventions." (*Id.*).  She then found, as follows:

---

[17] The "straight-leg raising (SLR) test" is "a physical examination technique to determine abnormality of the sciatic nerve or tightness of the hamstrings. The presence of sciatica is confirmed by sciatic nerve pain radiating down the limb when the supine person attempts to raise the straightened limb." *Id.* at 1546.

> Clmt with muscle and joint pains alleges disability due to fibromyalgia. This diagnosis is not substantiated in [the transcript or medical evidence] or by the objective findings at [the consultative examination].

(Tr. at 275). Dr. Dolan concluded that Valles' allegations were "not fully supported by [evidence of record]." (*Id.*).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Valles was 49 years old. (*See* Tr. at 33). She has a bachelor's degree in medical management, and an associate's degree in medical assistance, with a certification. (Tr. at 53). Valles' past relevant job experience includes positions as a medical assistant, a cook, and a line operator. (Tr. at 32).

### *Subjective Complaints*

In her applications for benefits, Valles claimed that she had been disabled, and unable to work, since September 1, 2006, due to "fibromyalgia." (Tr. at 162). She reported that this condition impedes her ability to sit, stand, walk, and lie down. (Tr. at 48, 50). Valles also stated that pain in her back, joints, and hips is the primary reason that she is unable to work. (Tr. at 36). She said that this pain began "gradually," with no precipitating injury. (Tr. at 37-38). Valles also stated that her condition has led to depression and fatigue. (Tr. at 37). She further reported that, on a typical day, she has "to constantly get up like every minute, every two minutes," and that she often "lay[s] down . . . every hour, every two hours." (Tr. at 48).

At the hearing before the ALJ, Valles testified that she worked full time "as a medical assistant" for two years. (Tr. at 32). She told the ALJ that her duties were similar to those of a receptionist, because they included "taking care of fifty-seven phone lines; and the patients that came in; taking documents, insurance cards . . . and also helping the doctor give injections, vital

signs, keeping records." (Tr. at 30-31). Valles explained that the reason she stopped working as a medical assistant was "[b]ecause of the pain," and the fact that she "was taking too much time at work." (Tr. at 36). She testified, as follows:

> ... my boss, she was very nice, you know, she pulled me to the side one way, she said, you know, your [sic] great and good to the office and the company, but I need somebody that can be here constantly and perform what they need to perform.

(*Id.*).

Valles testified that if she sits for "too long," then when she "stand[s] up, she feels like [her] ankles … lock." (Tr. at 50). Valles has never used a cane, but testified that her brother suggested, on the morning of the hearing, that she buy one. (*Id.*). She also testified that two months before the hearing, one of her doctors recommended that she get a cane, "especially [for] when [she] walks out of the house." (Tr. at 50-51). When questioned on why she had yet to buy a cane, Valles responded:

> That's exactly what I'm going to do, because my brother told me this morning . . . "you need to stop being stubborn."

(Tr. at 51). Valles testified that she had already purchased a wedge to place between her knees at night because the pain in "[her] back, joints, and [her] hips" prevented her from sleeping. (*Id.*). She testified that if she sleeps "four hours a night, that's a lot." (*Id.*).

Valles testified that, prior to the onset of her medical condition, she took only multi-vitamins and a vitamin D supplement. (Tr. at 43). She stated that she now takes medications for her pain, but that some of the side effects leave her "very groggy and tired." (Tr. at 48-49). She stated that, because of these side effects, she has stopped driving. (Tr. at 49). Valles explained that, in January 2010, after she drove following her medication, she damaged her car. (Tr. at 33-34). Valles denied consuming alcoholic beverages or smoking, or ever having used recreational drugs. (Tr. at 35). Valles testified that she is 5'4" tall, and that she weighs 140 pounds. (Tr. at 33).

Valles testified that she is right-handed, and that she experiences pain in her hands, especially in her wrists and fingers on her right hand.  (Tr. at 37).  She told the ALJ that in her last job as a medical assistant, she was asked to give "bariatric surgery patients B12 shots," for instance, and that she had difficulty doing so, because of the "pain in [her] wrist."  (Tr. at 47).  She testified that, instead, she would ask one of her coworkers to "do it for [her]."  (*Id.*).  Valles stated that she once hurt a patient, because she was "too rough" in administering an injection, because her hand was hurting her.  (*Id.*).  Valles testified that her condition has not improved since she stopped working.  (*Id.*).

Valles told the ALJ that she is married, but that her husband no longer lives with her, and that she lives with her brother, her son, and her daughter.  (Tr. at 34, 46).  Valles testified that, at the time of the hearing, her brother was unemployed, and collecting unemployment benefits.  (*Id.*).  Plaintiff told the ALJ that her son is an "emotionally [and] mentally handicapped" twenty-year old man, with the mental capacity of an eight-year old child, and that he gets disability benefits.  (*Id.*).  Valles told the ALJ that her daughter plans to attend college. (*Id.*).

When asked about her daily activities, Valles testified that she normally wakes up about 7:00 A.M., and uses "the bathroom . . . washes [her] face, and brushes her teeth."  (Tr. at 49).  She stated that her brother prepares a cup of tea for her and "makes her breakfast."  (*Id.*).  She said that she then takes her medication, and goes back to her room to watch television.  (*Id.*).  She stated that, after a few minutes, she might "get up again and . . . walk to [her] daughter's room" if she needs her to help with the laundry.  (*Id.*).  Valles testified that she currently takes Lyrica to treat her fibromyalgia, and Cymbalta for her depression.  (Tr. at 43, 52, 165).  Valles told the ALJ that she does not cook, because recently she almost dropped a frying pan, and burned herself.  (Tr. at 49-50).  Valles did say

16

that she can dust for "a little bit," but that, "if [she] gets tired, [she] does not last too long."  (Tr. at 50).

Plaintiff testified that she does not wear shoes with laces, because she would have to ask people to tie them for her.  (Tr. at 52).  Valles stated, as well, that she normally wears pants with elastic or spandex waists so that she will not "have to go through the trouble of putting on a belt or buttoning the button in the front."  (*Id.*).  She added that, if she does wear pants with a button or wears a belt, she has to ask her brother for assistance.  (*Id.*).  She reported that she also has trouble grooming and bathing.  (Tr. at 51-52).  Valles told the ALJ that she "[h]ad to cut [her] hair cause [sic] [of] the pain in [her] arms."  (Tr. at 227).

Valles claimed that an MRI "found bulging disc(s) in [her] neck and lower back," and that she did not believe that she could work in her "condition."  (Tr. at 44).  Plaintiff told the ALJ, as follows:

> This is me. What you see in front of you right now, that I'm fidgeting and sitting down, this is me all the time.

(*Id.*).   Plaintiff explained that she was "fidgeting and sitting down" both because of pain, and because she had failed to take her medication the morning of the hearing.  (*Id.*).

Valles testified that, near the end of her work life, she had been performing poorly, because of her condition.  (Tr. at 39).  She told the ALJ that that she began to stay home from work approximately one day a week. (Tr. at 39).  Valles explained that this later escalated:

> tak[ing] two weeks off out of [her paid time off]; that's how bad [her] body ache was. I took two weeks off.

(*Id.*).  Valles also testified to the following:

> I used to go to the doctor and say, my body aches.  And went, [sic] maybe you're coming down with the flu.  She would give me a B12 shot.  She would take blood

> work and urine samples, and she would say something like, it came . . . you have like
> a mono virus, you know, that you contracted to where, like maybe that's why you're
> tired, or maybe that's why you're hurting. And we always brushed it off.

(*Id.*).  Valles stated that, although she did seek treatment for body aches and flu-like symptoms, it

was not until January 2010, when her pain increased, that she decided to seek different treatment, as

the pain was not eased by antibiotics and medication. (Tr. at 40).  She told the ALJ that she did not

get an opinion from another doctor before then, for the following reason:

> I'll be honest with you, I didn't even bother. And my family kept yelling at me, what
> were you waiting for? First of all, I didn't have medical insurance, that was one.

(*Id.*).

### Lay Testimony

Valles' brother, Ronald Valles, also testified at the hearing.  (Tr. at 58).  Mr. Valles said that

he moved in with his sister "over a year" ago, to take care of her.  (Tr. at 59).  He told the ALJ that

he does "a lot of household chores [such as] mowing the lawn, washing the dishes, opening jars . . .

laundry . . . help[ing] her out of bed."  (*Id.*).  He said that his sister's "medical condition has been

actually deteriorating" in the past year.  (Tr. at 60).  He elaborated, as follows:

> It's a chore for her to get around.  And the medications that they've been giving her,
> they're increased by the doctor, and it's very difficult just for her to . . . just to drive
> a long distance without any supervision.  I'm in fear that she passes out or gets
> stopped and then she winds up in jail for being under the controls of the, you know,
> under a controlled [substance].

(*Id.*).  Mr. Valles testified that it has been "months" since Plaintiff last drove.  (*Id.*).  He also

reported that his sister cannot sit or stand "for long periods of time" without having to move, and

stated that "at times it feels like . . . or looks like she's going to climb the walls, if she's not sitting

down or standing up at intervals, between intervals."  (*Id.*).  He further testified that, "During the

day, when I come back from work, she's like, sitting in the chair and almost passed out because of

her medications, so I got to help her back in her bed."  (Tr. at 59).

### *Vocational Expert Testimony*

The ALJ also heard from Kay Gilreath, a vocational expert.  (Tr. at 29, 61).  The ALJ posed

the following hypothetical question to Gilreath:

> Q      For all hypotheticals assume a person the same age, education, work history
> as the claimant.  Assume a person limited to sitting for six to eight hours; standing,
> walking six to eight hours; able to lift and carry twenty pounds occasionally and ten
> pounds frequently; frequent climbing, but occasional climbing of ladders, ropes, or
> scaffolds; frequent balancing; occasional handling and fingering.

(Tr. at 61-62).  Gilreath testified that, based on those limitations, Valles would be able to perform

her past work as a medical assistant.  (Tr. at 62).

The ALJ then posed another hypothetical question to Ms. Gilreath, which prompted the

following exchange:

> Q      Assume a person limited to sitting for two hours; standing, walking six hours;
> able to lift and carry ten pounds occasionally and frequently; occasional pushing and
> pulling; occasional climbing, balancing stooping, kneeling, crouching, crawling;
> frequent reaching, handling, and fingering; person would need to alternate sitting and
> standing at will.  Would this allow . . . would these limitations allow any of the past
> work?
>
> A      No, your honor.
>
> Q      Would there be other jobs available in the person . . . in the regional or
> national economy for such a person?
>
> A      Within that hypothetical, one could work as a receptionist. Those will all be
> sedentary jobs I list. This is sedentary, semi-skilled, 4. DOT is 237.367-038. Over
> 15,000 in the state of Texas; over 200,000 nationally. Hospital admitting clerks.
> Sedentary, semi-skilled, with 4. 205.362-018. Over 5,000 in the state; 400,000
> nationally. There'd be insurance clerks.  Sedentary, skilled at 5. 214-362-022. Over
> 5,000, and over 200,000.
>
> Q      All right, if a person is limited to sitting less than two hours in a day; standing

19

and walking . . . or rather standing and walking less than two hours a day; sitting less than six hours in a day, how does that affect their ability to work in the regional and national economy?

A        That would rule out competitive employment.

(Tr. at 62-63).

Mr. Lynch, Plaintiff's attorney, also had the opportunity to question Gilreath.  (Tr. at 63).

He posed the following hypothetical question to her:

Q        If . . . take the limitations found in the consultative exam, the Social Security doctor, which could only lift five pounds; said hands are weak; inability to reach and feel and grasp, was weak in both hands with pain in muscles and joints; 3F5: unable to do repetitive work . . . that is only occasional reaching, fingering, lifting . . . I'm sorry, reaching, fingering, handling, would she be able to do any of her past work?

(*Id.*).  Gilreath responded, "well the past work didn't involve repetitive movement, but it did require

frequent."  (*Id.*).  The ALJ then asked:

ALJ     And you said, Mr. Lynch, that [she is] unable to lift more than five pounds, correct?

ATTY Right, correct.

Gilreath commented that such restrictions "would reduce someone to below sedentary." (Tr. at 64).

With that, the ALJ concluded the hearing.

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of

the record, he found that Valles suffers from "arthralgia, and degenerative disc disease of the

cervical and lumbar spine," and that those conditions are "severe."  (Tr. at 12).  He concluded,

however, that none of Valles' impairments, or any combination of impairments, meets, or equals in

severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations.

(Tr. at 13).  He further determined that Valles has the residual functional capacity to perform light

work that requires lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for six-eight hours in an eight-hour workday; and sitting for six-eight hours in an eight-hour workday.  (*Id.*).  The ALJ also found that Valles could perform her past relevant work as a medical assistant.  (*Id.*).  Ultimately, the ALJ concluded that Valles was not "disabled" for purposes of the Social Security Act, and he denied her applications for disability insurance benefits. (Tr. at 18).  That denial prompted Plaintiff's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Boyd*, 239 F.3d at 704.  Here, Plaintiff alleges that the ALJ made several errors in determining that she is not disabled. (Plaintiff's Motion at 1-2).

### *Handling and Fingering*

Before this court, Plaintiff claims that the ALJ's decision "that [she] could return to her prior work as a medical assistant is not supported by Defendant's finding that [she] could only occasionally perform "handling" and "fingering."  (Plaintiff's Response at 2).  She argues, in particular, that, according to the *Dictionary of Occupational Titles* ("DOT"), a "medical assistant" must perform "handling and fingering" on more than an "occasional" basis.  (Plaintiff's Motion at 4-5).  Plaintiff refers specifically to DOT's code 079.362-010, which states that the position of "medical assistant" may include the following duties:

Interviews patients, measures vital signs, such as pulse rate, temperature, blood pressure, weight, and height and records information on patients' charts. Prepares treatment rooms for examination of patients. Drapes patients with covering and positions instruments and equipment. Hands instruments and materials to doctor as directed. Cleans and sterilizes instruments. Inventories and orders medical supplies and materials. Operates x-ray, electrocardiograph (EKG), and other equipment to administer routine diagnostic test or calls medical facility or department to schedule patients for tests. Gives injections or treatments, and performs routine laboratory tests. Schedules appointments, receives money for bills, keeps x-ray and other medical records, performs secretarial tasks, and completes insurance forms.  May key data into computer to maintain office and patient records.  May keep billing records, enter financial transactions into bookkeeping ledgers, and compute and mail monthly statements to patients.

(*Id.* at 5).  Valles claims that the "handling and fingering" required for these activities is necessarily more than "occasional."  (*Id*. at 4-5).

The Commissioner correctly states, however, that "the requirements listed in the DOT are the maximum requirements for a position as it is generally performed and not the range of requirements of a particular job."  (Defendant's Response at 5).  Here, as the ALJ pointed out in his decision, Valles testified that her job as a "medical assistant" was similar to that of a receptionist. (Tr. at 15, 30).  The ALJ noted that Valles stated "that until the onset of her illness . . . [she] handled telephones, performed clerical work, gave injections, took vital signs, and kept patient records, and that all of these functions require 'handling and fingering.'"  (*Id.*).  At the hearing, Valles also testified that she could ask that some tasks that required "handling and fingering," such as giving injections, be performed by co-workers.  (*Id*.).  She also testified, however, that the only reason she could not work was "pain," and that, if she were "pain free," she would be able to perform the tasks required of a medical assistant.  (Tr. at 36).  In this case, after reviewing the record, and the testimony of the vocational expert witness, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a medical assistant, as she described the position.  (Tr. at 15).  The ALJ also found that there was very little evidence of any difficulty in "handling and fingering"

prior to February 2010, which was more than three years after she claims to have become disabled. (*See* Tr. at 15, 335, 164).  In weighing the record as a whole, there is sufficient evidence to support the ALJ's finding that Valles can perform her past relevant work as a medical assistant.  Valles has not shown that "handling and fingering" were integral to her ability to perform that job.  Further, the DOT description does not preclude the finding that Valles could perform the tasks required of her at her prior job.  As a result, Plaintiff has not shown that the ALJ committed an error on this issue.

### Lifting a Maximum of Five Pounds

Plaintiff claims that the ALJ erred because he "failed to consider the finding by Defendant's own consultative examiner that [she] was limited to lifting a maximum of five pounds."  (Plaintiff's Response at 5).  She argues that, had he addressed that finding, by Dr. Isaac, the ALJ would have concluded that she was "exclude[d from] all competitive jobs as defined by [the] Defendant."  (*Id.*).  Dr. Isaac's exact finding was that Valles "is able to lift and carry objects of 5lb to 40 feet."  (Tr. at 256).

It is true that, while the ALJ addressed Dr. Issac's findings at length, he did not comment specifically on the "five pound" limitation.  (*See* Tr. at 16-17).  In his decision, however, the ALJ found that there was no objective medical evidence that supported her claim that she could not perform her prior work.  (Tr. at 17).  Further, the more detailed RFC assessments made by the two other medical consultants, Dr. Durfor and Dr. Dolan, contradict Dr. Isaac's findings on the amount of weight that Plaintiff can lift and carry.  In particular, on June 14, 2010, and on July 21, 2010, respectively, Dr. Durfor and Dr. Dolan found that Valles could lift or carry items weighing twenty pounds "occasionally," and ten pounds "frequently."  (Tr. at 258, 271).  In this case, then, Plaintiff has not shown that the ALJ committed error by failing to adopt Dr. Isaac's findings with regard to

the maximum weight she can lift and carry.  As a result, summary judgment in Defendant's favor is appropriate on this issue.

### *Depression*

Plaintiff argues, as well, that the ALJ erred by "fail[ing] to evaluate and consider [her] depression and its non-exertional limitations adversely affecting [her] potential ability to maintain and sustain a full-time competitive job."  (Plaintiff's Response at 6).  In this case, however, the ALJ weighed her alleged mental impairments when making his decision.  First, the ALJ acknowledged that Valles was being treated for depression, and that she was taking Cymbalta for that condition. (Tr. at 15).  He also emphasized that the evidence showed that the Cymbalta had relieved Valles's symptoms of depression and of anxiety.  (*Id.*).  The ALJ noted, further, that Valles had only sought treatment for depression one month before the hearing.  (*Id.*).  He stated, specifically, that Valles "started [taking Cymbalta] a month ago, [and that] she [had] never [taken] medications before." (*Id.*).

In fact, the first record of Valles complaining about any mental health issues is dated one month prior to the hearing.  (Tr. at 15, 322-23)  It is only on December 7, 2010, that Valles first complained to Dr. Hoang about general depression and anxiety, and the doctor prescribed Cymbalta. (Tr. at 322-23).  On December 9, 2010, Valles saw Dr. Hoang again, and told her that she felt that the Cymbalta was helping her, that her "anxiety [had] improved and that she could sleep more at night."  (*Id.*).  In short, the record contains no evidence that Valles was suffering from a significant mental impairment, or one that was not remedied with medication, prior to the date of the hearing.

In any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence."  *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988).  However,

on this record, Valles has few complaints of depression, and she offers no evidence that her mental impairments are debilitating.   Here, the ALJ considered her complaints of depression, noted that there was scant and only very recent evidence of such a disorder, and that the condition was being controlled by medication, and he made a decision that is supported by substantial evidence.   As a result, the ALJ did not err in his decision on Plaintiff's complaints about depression.

### Side Effects of Medication

Plaintiff also claims that the ALJ failed to address the side-effects from her medication. (Plaintiff's Response at 8).   The law is clear that an ALJ should consider any side effects that "could render a claimant disabled or at least contribute to a disability."   *Loza v. Apfel*, 219 F.3d 378, 397 (5th Cir. 2000); *see Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999); *Bowling v. Shalala*, 36 F.3d 431, 438 (5th Cir. 1994).   On this record, however, there is little evidence that Valles suffers from significant side effects because of her medication.   At the hearing, Plaintiff testified that she "stopped driving," because her medication made her feel "groggy." (Tr. at 49).   It is true that the medical record from Valles' March 17, 2010, appointment with Dr. R. Wright shows that she complained that the muscle relaxers that she was taking "helped pain, but made her sleepy." (Tr. at 304).   And, at the hearing, Ronald Valles testified that she was sometimes "passed out" because of her medication. (Tr. at 59).   But there is no objective medical evidence in the record that side-effects from her medication were significant enough to prevent Valles from performing her duties as a medical assistant.   In fact, the ALJ found that Valles was capable of taking care of her own needs, doing work around the house, caring for her family, ambulating without assistance, and attending the hearing without distress. (Tr. at 15).   The ALJ concluded that the "intensity, persistence and limiting effects of [Valles'] syptoms are not credible to the extent they are inconsistent with the above

25

residual functional capacity assessment." (*Id.*). It is well settled that "an ALJ's assessment of a claimant's credibility is accorded great deference," so long as the record "contain[s] substantial evidence to support [his] decision." *Newton*, 209 F.3d at 459; *see Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). Finally, the ALJ did discuss her medications, and noted that Valles reported feeling better because of them. (Tr. at 14-15). Moreover, even if the ALJ should have specifically addressed the side-effects of her medication, on this record, Valles has not shown that, on remand, the ALJ would have grounds to reach a decision in her favor. *See Newton*, 209 F.3d at 458; *Ripley*, 67 F.3d at 557.

### Treating Physician's Opinion

Finally, Plaintiff argues that the ALJ erred because he "failed to follow [her] treating Physician's opinion that she was unable to work a full eight hour day." (Plaintiff's Response at 10). The "opinion" that Plaintiff references is a "Medical Source Statement of Ability to do Work-Related Activities (Physical)," completed by Dr. Randall Wright, which Valles submitted for the first time at the beginning of the hearing. (Tr. 27-28). The form is a standard SSA form, and contains the following language:

> "Are STANDING and/or WALKING affected by the impairment?"
> "**Yes….less than 2 hours in an 8-hour workday**"
>
> "Is SITTING affected by the impairment?"
> "**Yes…. Less than about 6 hours in an 8-hour workday**."
>
> Signed: Randall Wright, M.D., Neurology 12/09/2010.

(Tr. at 404-07 [emphasis added]).

The Fifth Circuit has repeatedly held that, as a rule, "the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and

responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621.  As a result, an ALJ may not reject a treating source's opinion without identifying specific, legitimate reasons to do so.  *See Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 453.  "Legitimate reasons" for rejecting such findings include instances in which the opinion of the treating physician is conclusory; the opinion is unsupported by medically-acceptable clinical, laboratory, or diagnostic techniques; or the opinion is otherwise unsupported by the evidence.  *See Shave v. Apfel*, 238 F.3d 592, 595 (5th Cir. 2001); *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).  Ultimately, conflicts among the various medical opinions of record are within the purview of the Commissioner – and not the courts – to resolve.  *See Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

In his written decision, the ALJ expressly addressed the "Medical Source Statement of Ability to do Work-Related Activities (Physical)."  (Tr. at 18).  He found that "there are no clinical records that support the severity of the findings in this exhibit."  (*Id.*).  And he noted that "[a] review of this document also shows an illegible signature and includes misspelled words (bulgen versus bulging) as well as different pen ink for the signature and comments."  (*Id.*).  In addition, the ALJ found that "there [was] a scarcity of clinical records regarding the treatment history of the claimant by Dr. Wright."  He then explained that he was not giving significant weight to the record, for the following, specific reasons:

> Therefore, I give little weight to this Medical Source Statement.  More credible is the longitudinal treatment records by Dr. Hoang at Exhibit 11F that rarely mentions back pain or a diagnosis of fibromyalgia.  Other than the Medical Source Statement at 13F, the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision.

(*Id.*).  In this case, the ALJ did all that was required of him in considering a treating physician's

opinion. *See Shave*, 238 F.3d at 595; *Bradley*, 809 F.2d at 1057.  As a result, he committed no error.

### *Prejudice*

It has long been established that, even if an ALJ errs, his decision will not be disturbed unless "the applicant shows that [she] was prejudiced." *Ripley*, 67 F.3d at 557 (citing *Kane*, 731 F.2d at 1220); *see Newton*, 209 F.3d at 458.  In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached.  *See id.* (citing *Ripley*, 67 F.3d at 557 n.22).  In this case, even had the ALJ erred in the manner alleged, Valles has simply not shown that, on remand, the he might find that she is disabled, and eligible for benefits.  *See Randall*, 570 F.3d at 652; *Audler*, 501 F.3d at 448; *Newton*, 209 F.3d at 458.  Here, Plaintiff has not demonstrated that she has been prejudiced by any actions or omissions on the part of the ALJ.  *See Newton*, 209 F.3d at 458 (citing *Ripley*, 67 F.3d at 557 & n.22).  For that reason, it is recommended that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

## Conclusion

Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, and that Defendant's motion for summary judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the

chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

  **SIGNED** at Houston, Texas, this 2nd day of July, 2013.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**